# EXHIBIT A

S. KENT

when I was a cabdriver. That's all I can think of.

Q. When did you receive the bachelors from Georgetown?

A. 1970.

Q. When did you graduate St. Johns?

A. 1976 or '77. '77 I think.

Q. When did you get your masters from NYU?

A. About 1980.

Q. That was NYU Law School?

A. Yes.

Q. In what subject?

A. Corporate.

Q. They have a few different masters. That's corporate. And Fairfield University was that also from their law school?

A. No, that was before law school. That was just a masters. I was going to be a teacher. That was a masters in education or history, something like that.

Q. Other than those four schools have you ever received a degree from anywhere else?

A. No. High school but that's it.

Q. When were you admitted -- back up. In how many states are you admitted to practice?

S. KENT

A. New York.

Q. When did you receive your license?

A. 1978.

Q. Has your license been in good standing from then until now?

A. Yes.

Q. Have you ever been disciplined suspended or in any way had any proceedings regarding your license?

A. No.

Q. Are you licensed in any other states?

A. I think I have some U.S. District Court. I have a license in the District of Columbia I think. I think it's still intact but if it lapsed then I'm wrong.

Q. I would like you to, please, take me through your professional history beginning from when you got your law license in New York in 1978 and going up to when you began your affiliation with the Levinsohn firm.

A. I was associate attorney at Wilson Elser Moskowitz Edelman Dicker from -- I was sort of a paralegal in law school then I became an associate attorney in '78 and I became a partner there in

S. KENT

about 1985 or 1984, somewhere in the mid-eighties and I remained a partner there until age 69 and they had a clause in the partnership agreement and I was retired in 2017, I'm pretty sure. And I was asked by Peter Berger to work with him at Levinsohn & Berger. We worked together at Levinsohn & Berger I would say from about 2018 until COVID and his death and I think June of 2020. Hopefully these years are right.

And then I got the opportunity to join Messner Reeves, due to my relationship with Abby Nitka, and I worked at Messner Reeves until about April 2022 or August maybe '22, maybe April '22, and then after leaving Messner Reeves I worked a lot with Levinsohn Berger but in a different capacity then I worked with before. I do strictly of counsel work and I also do of counsel work for other law firms, two other law firms.

Q. Which firms?

A. Veronica Banton of Mount Vernon, New York and Sam Druckman of Brooklyn, New York. And if I do any other work for lawyers, other lawyers like pro bono work it's escaped me right now and if you wants to leave a blank and if I see anything that

S. KENT

qualifies I will fill it in.

Q. You were with the Wilson Elser New York City office; correct?

A. Yes.

Q. Wilson Elser is a big firm. With which department or group were you affiliated?

A. I guess you'd call it professional liability.

Q. Does that mean malpractice cases?

A. Yes.

Q. And were you in that role from the time, or that department, from the time you joined the firm in 1978 until you were retired in 2017?

A. I was principally in that department but there was a period of time where I was also put in charge in an informal way of trying to develop a corporate practice group for transactional work.

Q. Would it be fair to say that during the approximately 39 years you were at Wilson Elser you were primarily engaged in litigation or arbitration matters?

A. Yes.

Q. As I understand it you have claimed in this case that you had an agreement or contract with

Messner Reeves; is that correct?

A. Yes.

Q. Okay. Were you ever named a partner or shareholder in Messner Reeves?

A. No.

Q. I'm going to show you what we're going to mark as SK-1 and these are this is the document titled First Response of Plaintiff to the First Request for the Production of Documents and First Set of Interrogatories of Defendant.

(First Response of Plaintiff to the First Request for the Production of Documents & First Set of Interrogatories of Defendant was introduced as Exhibit SK-1.)

A. Thank you.

Q. Just for the sake of clarity I'd like you to take a look at this document, it's 13-pages long, and confirm that you prepared this document in response to the Discovery Request that we submitted to you.

A. I did.

Q. And on the bottom of page ten there's a verification with your typed signature and this in effect your execution and verification of the

S. KENT

interrogatories answers; correct?
A. Correct.
Q. I'm going ask you a question, which actually concerns two of your responses because your responses are the same. Question three asks, "Describe all documents exchanged between you and Messner Reeves regarding your compensation arrangement including dates, participants, and substance of each document."
A. Is this in the interrogatories?
Q. Yes. It starts on the bottom of page six. If you want to go there before I continue, please, do so.
A. Yup.
Q. If you go to page seven the next question is, "Identify all documents in which Messner Reeves allegedly promised to pay you a fair and proportionate share of fees." And you see in the answers you stated certain objections and then you referred to documents bearing the Bates numbers from your production 1 to 43, 298 to 315, and 316 to 429. Do you see that?
A. Yes.
Q. I'm going to show you, and we're going to

S. KENT

mark three exhibits, SK-2 are documents that you produced to us under Bates stamp number 1 to 43, and for purposes of not killing anymore trees then necessary, this is a double-sided copy. SK-3 is a document production that you made. Again, double-sided copy. It's 298 through 315. And SK-5 are the documents that you produced to us under Bates stamped numbers 316 through 429.

Place all of these in front of you now and I want you to point out where in this document is the agreement by which you claim Messner Reeves agreed to pay you for the work that you did or you claim that you did that's part of this lawsuit.

(SK-R-000001-SK-R-000043 was introduced as Exhibit SK-2.)

(SK-S-000298-SK-S-000315 was introduced as Exhibit SK-3.)

(SK-E-00316-SK-E-000429 was introduced as Exhibit SK-4.)

A. The actual agreement was an oral agreement. These document reflect the agreement.

Q. Show me where in the documents they reflect the agreement.

A. You want me to go through two, three, four

S. KENT

and then -- okay. I have a message to Ms. Nitka, eight and nine, also 10, 12, 13, 15, 16, 17, 22, 24,25 and then 26 to 32. That's in the first batch.

Q. Let's just focus on this and we'll get to the others in a minute.

A. Okay.

Q. So I think you said the first page that you mentioned was an email which appears, I think it's on page eight, and that appears to be an email, it's judging of this, you sent to yourself; is that correct?

A. Well, I did send it to myself recently but it's something that I sent to Abby. Let's see if I can date it properly. The prior email page says December 9, 2019, so it was either in December 2019 or January 2020, and the subject of the memo says a reply can wait until 2020. So I think page eight and nine was originally sent in 2019, and in December of 2019.

Q. On page ten you start off that page by saying, "I've never made a proposal like this before." The paragraph continues and then goes on in the next paragraph to say, "Think over this proposal. Ask me any questions you might have.

S. KENT

Take whatever time you need and let's try to get together early in the new year if you're interested in discussing this further." Did you ever receive a written response from Ms. Nitka to this email?

A. You know, this proposal -- okay. Did I ever get. I did get a response from Ms. Nitka, yes.

Q. What was her position at Messner Reeves at the time?

A. She was a managing partner of the New York office of Messner Reeves.

Q. Let's talk about Messner Reeves for the moment. As of the fall or December of 2019, January 2020, what was your understanding of who was the -- whether there was a managing partner?

A. I think the website said that Abigail Nitka was the managing partner of the New York office of Messner Reeves.

Q. What about of the firm as a whole?

A. She was not the managing partner.

Q. Who was?

A. I can't remember. It might have been Mr. Messner or Mr. Reeves but I'm not sure.

Q. Did anybody from Messner Reeves ever submit to you any type of written agreement or

S. KENT

contract which set forth the terms of your relationship with that firm?

A. I don't think so. Not until at the very end I got this solicitation for a review. They were -- for some reason -- although it was Toll Partners I think. Jim Smith, the president of Messner Reeves, asked me for a report on my financial standing in terms of business produced and I sent him a report.

Q. On this page ten there are couple of handwritten notes. There's a deletion. Is this your handwriting?

A. Yes. You know, looking at now the pages together, this was a draft of something that I eventually sent, which is in final form starting on page 15 and running to page 17, because by the time I got to 17 I corrected the spelling on year and the date of this thing is December 13, 2019. So the documents which appear in 2008 through 2010 -- well, whatever is in on ten, document number ten, is an earlier draft of the document that concludes on 17.

Q. Which is the email that you sent to Ms. Nitka on December 13.

A. That email is a final form. There were

S. KENT

earlier drafts. I think you request extended to earlier drafts of things so I produced -- I guess I had the earlier draft in my file and produced it.

Q. So on page 17 it says, "I've never made a proposal like this before." and it goes on in language similar to the page that we talked about a couple of minutes ago. Did you ever receive a written response from anyone at Messner Reeves regarding your proposal?

A. I know I got responses from Abby Nitka and she introduced me to some people who had a connection with the New York office, in terms of their titles, who visited New York. Michelle Harden is reflected on 24. Robin Long I had a lot of dealings with -- and I think I produced everything I could find on what was sent to me by Messner Reeves and that includes Jim Smith.

Q. So anything that would have any -- that would in any way reflect what you claim is your agreement with Messner Reeves is material that you have produced to us now in full; correct?

A. I think this covers it, yeah. There's language in this that reflects the agreement.

Q. Pages 18 and 19 contain a series of

S. KENT

understanding of her position within the firm?

A. I think she spent most of her time in Colorado but she did come to New York occasionally and she had some sort of designation as being involved as a New York attorney.

Q. Then one of the other documents you referred to as confirming your contractual relationship or claimed contractual relationship are the materials which appear on pages 26 through I think 32 you said. This is just an article from a the magazine or website; is that correct?

A. Yes.

Q. Did you ever ask anyone at Messner Reeves to send you any type of contract or agreement which would formalize your status?

A. I think I eventually asked Jim Smith. You know, he took a position that I thought was unreasonable. I may have asked him about it or just may have dismissed the idea but it didn't seem like he was receptive of the idea. It didn't seem like he thought I produced enough business.

Q. When did you have this conversation with him?

A. I think it was in 2022.

S. KENT

Q. And was this a phone conversation, a Teams meeting, in person, or something else?

A. I think by phone and by exchange of emails.

Q. How many such conversations were there that you had with Mr. Smith at that time concerning the subject of your relationship or claimed contractual relationship?

A. At the beginning of the relationship. This evolved after Mr. Berger's death. I wasn't just going to help Abby try to generate insurance defense business. I actually, because of Mr. Berger's death Abby and I started talking about me becoming of counsel to the firm and I was in touch with Jim Smith during that early period. At times I think I was -- the most interactions I had with him was at the beginning when I started in mid-2020 and then at the end when I left in I think April of '22.

Q. My question was this: You said that you had a conversation with Mr. Smith or a couple of telephone calls perhaps in 2022 when you said he was taking what you thought was an unreasonable position and my question is when was the first time in 2022

that you had these conversations, which you claim he took an unreasonable position?

A. Let's see. I think it's in Exhibit 3 but let me just make a note of something. Let's see. Document 299 is an email in March. So that started this. March of 2022 was the start of this dialogue, which ended up with him taking an unreasonable position.

Q. And what's the position that he took that you claim is unreasonable?

A. He wanted to treat me as a partner when it came to firm expenses. He told me that, okay, you generate the $250,000 but we have to take into account expenses that were incurred. He may have mentioned Las Vegas, Phoenix. He may have mentioned all of the offices but maybe those were offices that had a net loss or something and he said according to our calculations -- and he was sort of treating me as a partner, the debits that we're assessing you with exceed the $250,000 you produced and I thought that was unreasonable position. He recognized I was entitled to something. He recognize that we had an agreement but the way he applied the agreement was not the way as reflect in one of the earlier

S. KENT

exhibits, the way of counsels are treated. They're not treated like partners and also they have to be credited for the profits of those other offices. When I was a partner at Wilson Elser I would get -- if an office was profitable I'd get a share of the profit of that office as a partner. I wasn't a partner at Messner Reeves. I didn't expect to be credited with any profits from any other office, nor did I think I would be debited with any expenses from any other office, but Mr. Smith told me that this is why I was entitled to no money.

Q. I should have asked this before but I didn't when you became or were a partner at the Wilson Elser firm did you sign any kind of partnership agreement or any similar type of document?

A. Yes.

Q. And nothing like that was ever presented to you at Messner Reeves whether you were a partner, of counsel, or in any other kind of relationship; correct?

A. No.

Q. You said that Mr. Smith recognized that you had an agreement, I think that's what you said.

S. KENT

What specific words did he say that you claim were his recognition that you had an agreement?

A. You brought in $250,000, we have all the numbers on that, we agree with the numbers on that, we agree with the numbers. We have no dispute with you over the money that you brought in but we're assessing you these expenses from other offices. So that was his understanding of the agreement, which wasn't my understanding of the agreement. My understanding of the agreement is reflected in the page numbers 26 to 32.

Q. Well, 26 to 32 was an article from a website; correct?

A. Yes.

Q. Did Mr. Smith or anybody in management at Messner Reeves say that they agreed that this was going to be the basis for a compensation system with you?

A. Well, Abby Nitka received it and said that makes sense and Jim Smith will be fair with you, that's what she said.

Q. By the way, what was the agreement?

A. The agreement was for me to bring in business and on an of-counsel basis, after the

S. KENT

deduction of overhead and the profits that would be distributed to the firm, that I would get 40% of the business that I produced.

Q. And where in writing would I find that?

A. Well, it was part of a dialogue. I don't think it's in writing. The only writing that represents that are the pages I've just shown you, 25 through 32.

Q. Okay. Did you ever have any -- let me back up. Was there a different managing partner of the overall firm at that time? I think his name was Caleb Meyer. Does that name ring a bell?

A. Yes. I know he was managing partner at some point during my tenure but I'm not sure if he was in 2019, but he may have been.

Q. Did you ever have any discussion with him about this 40% arrangement that you claim existed?

A. No.

Q. And the 25 through 32, that's this article that you pulled off a website; correct?

A. Yes, but I sent it to Ms. Nitka.

Q. Did she ever say anything along the lines that -- what, if anything, did she -- let me rephrase the question. Did she ever say anything

S. KENT

about whether she would need to discuss this proposed arrangement or get approval from anybody at the home office in Denver?

A. She said Jim Smith will be fair.

Q. Did you ever confirm this arrangement with Mr. Smith in or around 2019 or 2020?

A. I talked to him in 2020 and we agreed that I would be compensated. This was a verbal agreement in the standard way that of counsels are compensated. He didn't say anything about me being a partner and I never asked him to be a partner. There was no partnership agreement and the term partner never applied to me during my entire period at Messner Reeves, whether in court documents or in internal communications. I was always had a designation as of counsel.

Q. And just so we're clear, he never wrote, neither he or anybody else on behalf of the firm ever wrote to you to confirm this 40% arrangement; is that correct?

A. It was verbal.

Q. So it was never written; correct?

A. It was verbal, not written.

Q. On the top of page 298 from your

S. KENT

arrangement with Messner Reeves.

A. That's your view of the case. You're an advocate for your client. I'm an advocate for myself and I think it's all reflected in there but we'll allow the fact finder to figure that out. I mean, you asked this question ten different ways and I think asked and answered is an appropriate response but if you want a ruling we can call up the magistrate.

Q. In your interrogatory answers -- let me rephrase that. Who was it that you claim engaged in fraud on behalf of Messner Reeves with respect to your contractural arrangement?

A. Jim Smith.

Q. Anybody else?

A. Nope.

Q. When did Mr. Smith make the fraudulent statements that you claim he made? Let's just focus on the date first.

A. He said that I was going to be treated as of counsel and then in '22 we tried to figure out what was owed to me he applied overhead calculations that were not appropriate for an of counsel status.

Q. Let me go back to my question. When did

S. KENT

he have the conversation when he told you were going to be treated as an of counsel?

A. In 2020.

Q. When in 2020?

A. August, September, October, in that period we had some communication back and forth.

Q. And what was the specific thing that he said that you claim was fraudulent?

A. That I would be treated as of counsel.

Q. Is there anything else that he said that you claim, as you claimed in your lawsuit, that he engaged in fraud?

A. He may have said you're not a partner of course and I said, no, I don't expect to be a partner, I don't want to be a partner.

Q. If he said you're not going to be a partner that statement was true; correct?

A. Well, then he treated me as a partner in calculating what I was entitled to. So I was defrauded because be treated me as a partner after telling me I wouldn't be treated as a partner.

Q. You were never made a partner in the firm; correct?

A. That's asked and answered. That is

S. KENT

correct.

Q. What else, if anything, did he say that you claim was a fraudulent statement, if anything?

A. That was it.

Q. Okay and when he said you're going to be treated as of counsel what was the specific arrangement that you made with him that you claim was fraudulent?

A. The way they calculated the overhead.

Q. Now, you were -- you had this ongoing relationship with Messner Reeves from -- well, beginning when? Let me ask you that. When did you start your relationship with them as of counsel or whatever it was?

A. Well, I formally came on board and you can look at the date of the first bill, I think that, and the date of a consent to change attorney, that's when I actually started representing Messner Reeves directly. Before that slightly before the pandemic and less so because the pandemic really shut down a lot of communications but in the months before the pandemic, maybe November of 2019, but certainly there were communications going on. It may be that it was earlier in the fall but by December of 2019

S. KENT

Abby Nitka and I were working on a joint marketing approach so more assignments could find their way to Messner Reeves.

Q. What is your best recollection of when you formally became of counsel or whatever your position was with Messner Reeves?

A. I think the agreement might have been in July of 2020 and then the actual first billing may have been for August of 2020. You want me to consult the bills and tell you exactly? I have the bills with me.

Q. You give me your best recollection, that's all I need for the time being. As you understood or thought you understood it how was payment going to be made on account of the fees that you generated. Were you going to be paid monthly, quarterly, annually, something else?

A. I wanted to build up and I was hoping to build up more collections than I received and I wasn't received any distributions, no, and I kept producing more business trying to get more money in the door.

Q. That wasn't my question. My question was: Under the arrangement that you claim you had how

S. KENT

often were you going to be paid on the account of the money that you claim you were owed. Were you going to be paid once a year, monthly, quarterly, every six months or something else?

A. Probably when I came to them and reconciled and what they owed me.

Q. When you "probably," so do I understand that you never really had an understanding with them about when you would be paid?

A. Well, I got an invitation from Mr. Smith in 2022. I guess they would expect to me to ask and I asked in 2022.

Q. So you were generating work as I understand it beginning in August or September of 2020, continued to generate work or billings at least through the end of 2020 and through all of 2021 and at no point did you request payment on account of your origination; is that correct?

A. That is correct.

Q. And did anybody come to you and raise the subject of your originations or when you were going to be paid or anything like that?

A. I can't recall that happening.

Q. Did you find it odd that after that you

S. KENT

were now working for the firm for five actual quarters apparently and had not received any money on account of the billings that you generated?

A. It was mostly because of my own personal financial timing of things. 2021 was a year where I was trying to collect money from the Levinsohn Berger time period. Peter Berger had died and his son and I were trying to collect money on old business and the money was coming in in 2021 on old business and I really wasn't anxious to make 2021 a year when my taxable income would reach such heights that I might be better off collecting them in '22 from a tax standpoint.

Q. Let me show you what we're going mark as SK-5, Plaintiff's Initial Disclosures Pursuant to FRCP 2681.

(Plaintiff's Initial Disclosures Pursuant to FRCP 2681 was introduced as Exhibit SK-5.)

A. Okay.

Q. These are initial disclosures that you prepared; correct?

A. Yes.

Q. Did anybody help you prepare these?

S. KENT

A. I called him back and he said my billings were under water and that he was applying overhead from offices other than New York. I think I engaged in very brief dialogue about overhead from New York, the fact that I was the only attorney in the office, even the managing partner, Mr. Shaw, was not really showing up. We discussed things. I think I asked him -- well, I would imagine that my involvement with the office on an of-counsel basis didn't have any impact on your change of the office from a really barebones operation up on Third Avenue to this more prominent and highly attractive sort of luxury accommodation office type that you put up on Pine Street and he said, no. He said that the way they calculated things they were applying overhead from other offices.

I said that doesn't make any sense. I think I told him at that point that then you have to apply the profitability of those other offices too to me because you're starting to treat me like a partner now and he said I will give you $25,000, that's it. I said that's unfair, that's unacceptable, I will be leaving the firm, and he wired me the $25,000.

Q. So you did in fact --

S. KENT

A. And it terminated. My last day was the end of April.

Q. So here on April 28th he writes back to you that per your conversation he was going to wire you $25,000, he will terminate the relationship as of Friday, April 29th of 2022, and then you write back to him on Thursday, also on the 28th, and you give him the routing number and account number for the money; correct?

A. Let me find that one.

Q. It's on page 304.

A. Yes, I did.

Q. And you received the money; correct?

A. Yes.

Q. On page 308 there's an email between you and somebody named Greg Morrison who's an accountant. What was your understanding of his role within the firm?

A. This was April 29th. I guess he needed this as part of the payment to me.

Q. Then let's go to the last three pages 313 to 315 .these are the profit and loss statements that Mr. Smith sent to you in that email on April 27th; correct.