UNITED STATES DISRICT COURT OF THE
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
STEVEN KENT,

Plaintiff,

-against-

MESSNER REEVES, LLP

Defendant.
------------------------------------------------------X

Docket No.: 25-CV-10515 (DEH)(SN)

**DECLARATION OF STEVEN KENT IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

The undersigned, Plaintiff Steven Kent, hereby declares under oath, pursuant to 28 U.S.C. Section 1746 and under penalty of perjury, that the following testimony is true and correct:

1. I respectfully submit this Declaration a) in opposition to the Defendant's Motion for Summary Judgment, and b) in support of Plaintiff's Cross-Motion for Summary Judgment. I have personal knowledge of the matters set forth herein or knowledge based upon my review of the files and records maintained in my files and in computer records. If I am called as a witness, I can and will testify competently and truthfully as to such matters, files, and records.
2. I was admitted to practice law in New York State in May 1979. For almost 40 years, from 1978 to 2017, I was engaged in litigation and trial practice as a law clerk/paralegal, associate attorney, and partner at the New York City office of Wilson Elser Moskowitz Edelman & Dicker, a national law firm with offices in numerous states and foreign cities.
3. In addition to my work with fee paying clients, I engaged in an extensive *pro bono* litigation practice, in conjunction with free legal service providers such as the Safe Passage Project, New York Law School, and the Fifth Avenue Ecumenical Outreach Partnership. I was twice

awarded the Mayoral Service Recognition Certificate for my *pro bono* work on behalf of children from Mexico and Central America.

**My Introduction to Defendant Prior to Covid**

4. After my retirement from Wilson Elser in 2017, at age 68, I continued to practice law and engage in the *pro bono* work at a small three-person intellectual property law firm, Levisohn Berger LLP. Late in 2019, at a Mayoral Recognition award ceremony at New York Law School, which included me as a recipient, I ran into Abagail Nitka, the partner then in charge of the Defendant's New York City office. Ms. Nitka had worked with and been supervised by me as a young associate attorney during my tenure as a partner at Wilson Elser.

5. At the ceremony, not surprisingly, Ms. Nitka expressed a strong interest in *pro bono* work and asked me to provide guidance so she could involve her younger colleagues at the Defendant law firm in *pro bono* work. Attached as Ex. "1" are copies of emails showing the support I provided Defendant and its attorneys prior to my joining Defendant the following year.

6. During December 2019, my exchanges with Ms. Nitka expanded and evolved into a "joint marketing" plan which would help Ms. Nitka introduce new paying clients to Defendant. I submitted emails to Ms. Nitka with lists of potential clients, and Ms. Nitka submitted the client lists to her Managing Partner and CEO, Caleb Meyer. See annexed Ex. "2."

7. We together planned to attend as a team an insurance industry symposium sponsored by the Professional Liability Underwriting Society ("PLUS"), so I could introduce Ms. Nitka and her firm, the Defendant, to the many contacts I had developed during my years at Wilson Elser.

8. My motive in assisting Ms. Nitka was to help a former colleague and friend advance her career, and because my three-person intellectual property law firm was ineligible and not equipped to handle a large or even modest volume of professional liability defense cases, the specialty practice that Ms. Nitka and I had shared.

9. On the other hand, the Defendant, a large law firm with offices located throughout the U.S., was perfectly positioned to handle professional liability defense cases assigned by the insurance companies I had worked with during my years at Wilson Elser.

10. The insurance companies which were the target of the joint marketing effort included AIG, Allianz, AXA, Berkley, Berkshire Hathaway, Beazley, Brit, Chubb, CNA, Lexington, Hartford, HDI, Markel, Navigators, Travelers, Willis, and Zurich. See annexed Ex. "3."
11. Prior to the Covid shutdown, from February 25 to 27, 2020, Ms. Nitka and I attended the PLUS Annual Conference at the New York Hilton and promoted the capability of the Defendant's many offices located throughout the U.S. to handle professional liability defense matters. See annexed Ex. "4."
12. My communications with Ms. Nitka and later Defendant's most senior management also involved the *pro bono* legal work with the Safe Passage Project, New York Law School, and the Fifth Avenue Ecumenical Outreach Partnership, which was undertaken on behalf of immigrant children, their families, and/or persons threatened with homelessness and/or deportation. Declaration of Eric Savage ("Savage Dec."), Ex, "D."
13. On March 5, 2020, I sent a note of introduction to Judge Alice R. Schlesinger, J.S.C., New York County, in a further effort to "cross-network" with a retired member of the New York State Judiciary. My goal was to further the Defendant's visibility and involvement in *pro bono* matters by networking with a distinguished retired Judge who was highly and visibly involved in the provision of legal services for indigent clients. See annexed Ex. "5."

**Covid, the Closure of My Firm, and My Negotiations with Defendant**

14. However, shortly thereafter, on or about March 15, 2000, the Governor and Mayor of the State and City of New York issued the Covid shutdown orders which brought about the closure of the law offices of both Defendant and my firm, Levisohn Berger.
15. Both law firms then commenced operations on a remote basis. Defendant elected to maintain a functioning office but did not renew its lease at the full service, floor sized office it then occupied, at 805 Third Ave. 18th Floor. Defendant instead relocated to a three-room shared office facility, operated by NYC City Office Suites, located on the 16th floor of 733 Third Avenue. See annexed Ex. "6."
16. Levisohn Berger also elected to discontinue its lease of shared office space at 11 Broadway, Suite 615; June 15, 2020 was scheduled as the final day of the lease. However, on June 11, 2020, Peter L. Berger, the managing partner of Levisohn Berger, passed away, leaving Levisohn Berger as a two-lawyer firm, consisting of the undersigned and Jonathan Berger, Peter Berger's son.

17. The Covid shutdown and Peter Berger's death had a powerful and disruptive impact on my plans. At the beginning of the Covid shutdown, Ms. Nitka and I were amid a joint marketing effort beneficial to Ms. Nitka and the Defendant. But with the death of Peter Berger a few months after the Covid shut down, Ms. Nitka and her colleagues within Defendant's senior management entered into a dialogue and their negotiations with me. The intent was to move Plaintiff's entire practice, with both the paying and the *pro bono* clients, to Defendant. See annexed Ex. "7."
18. Ms. Nitka involved Jim Smith, Defendant's President, in the negotiations. After multiple discussions, I began the process of transferring my "of counsel" relationship with Levisohn Berger to an "of counsel" relationship with Defendant. See annexed Ex. "8."
19. Defendant's managing partner for its New York office said that I would be fairly compensated. She said the firm's "of counsel" attorneys were paid in a fair and reasonable manner, as reflected in the widely accepted industry publication that I submitted to Defendant prior to joining. See annexed Ex. "9."
20. Written agreements were prepared by the parties, the client, and the insurance company responsible for the fee payments collected through my efforts. Notices of Appearance, Engagement and Fee Agreements, and Consents to Change Attorneys were also signed by the parties. As a result of these written documents, the Defendant was qualified to collect $254,957.94 in legal fee payments during the period September 2020 to April 2022. See annexed Ex. "10."
21. Thereafter, I acted as the principal and billing attorney on behalf of the legal clients I introduced to Defendant during the period May 2020 to April 2022.

**My Agreement with Defendant and Subsequent Activities on Its Behalf**

22. Once I began working at the Defendant's New York office -- particularly after the employment of Jason Rickets, Defendant's sole non-lawyer in New York, was terminated on November 3, 2021 -- I served as Defendant's *de facto* office manager in New York. See annexed Ex. "11"
23. I helped manage the receipt of correspondence, including court related filings; hired and managed a part-time staff; and managed all office activity including the scheduling and conduct of depositions, meetings, and client social gatherings. See annexed Ex. "12."

24. My agreement on compensation was oral and is set forth and/or referenced in various documents exchanged by the parties, and also through Defendant's course of conduct in agreeing to compensate Defendant's other "of counsel" attorneys on the basis of the fees Defendant collected as a result of their efforts.
25. The documents reflect the parties' oral agreement with respect to compensation, as does Defendant's course of conduct in agreeing to compensate Defendant's other "of counsel" attorneys on the basis that was promised to me. Defendant confirmed the 40% compensation arrangement by accepting the proposals submitted prior to June 2020, when the "of counsel" relationship was under negotiation.
26. My relationship with Defendant constituted an oral agreement, with Defendant to receive payment for the legal work Plaintiff performed and Defendant collected due to my efforts. The oral agreement is referenced in the various documents exchanged by the parties, as well as through emails and Defendant's course of conduct in agreeing to compensate Defendant's other "of counsel" attorneys on the basis of the fees Defendant collected as a result of the efforts of such attorneys.
27. The parties' emails reflected an agreement with Defendant whereby I would bring in business to Defendant on an "of counsel" basis and, after the deduction of overhead and profit, receive 40% of the fees collected.

**My Dealings With Defendant's Senior Management**

28. My dealings with management included Abagail Nitka, the New York office's Managing Partner, Jim Smith (the President of Plaintiff), Eleanor Deaton (Vice President of Human Resources), Michelle Harden, (Chief Operating Officer and Managing Partner of Defendant's home office in Denver), and Caleb Meyer, Defendant's Managing Partner and CEO.
29. The management personnel who communicated with me did not instruct or direct me to contact Caleb Meyer with respect to the "of counsel" relationship, or with respect to the parties' compensation arrangements.
30. However, Ms Nitka, in an email of June 12, 2020, reported to Caleb Meyer on the client development efforts she and I had undertaken with a group of twenty-eight dental practices. Caleb Meyer responded in an email the same day that with respect to conflicts and his interest in the representation, namely that he had "No Problem" with taking on these clients. See annexed Ex. "13."

31. The client list reviewed by Caleb Meyer was dated June 1, 2020. See annexed Ex. "2." The responsible partner from Defendant's Las Vegas office, Renee M. Finch, also responded, saying she supported our marketing effort with the twenty-eight dental practices. See annexed Ex. "13."
32. On August 3, 2020, Ms. Nitka included Mr. Smith on an email which provided instructions on the billing of my time. See annexed Ex. "14."
33. On August 8, 2020, after speaking with Eleanor Deaton, Vice President of Human Resources, and at her direction, I sought again to contact Jim Smith, but he did not get back to me. See annexed Ex. "15," an email from August 11, 2020.
34. On August 11, 2020, I spoke to Eleanor Deaton again, and we again agreed I needed to talk directly with Jim Smith, which I finally did shortly thereafter. See annexed Ex. "16."
35. On August 12, 2020, after our discussion, I copied Mr. Smith with my email on imputing the time on my billable matters, so the firm could start to "get the money in the door." See annexed Ex. "17."
36. On August 20, 2020, I sent a detailed compensation proposal to Ms. Nitka, seeking her input on its submission to Mr. Smith. Pursuant to an exchange of emails a few days later, Ms. Nitka forwarded my compensation memo to Mr. Smith for consideration. See Annexed Ex. "18."
37. On September 10, 2020, Ms. Nitka followed up on the compensation proposal with Mr. Smith, and copied the Defendant's Chief Operating Officer, Michelle Harden, with the email. See annexed Ex. "19." We spoke about the compensation proposal on September 15, 2020. See annexed Ex. "20." At no point did Mr. Smith object to my memo on compensation, until almost 2 years later, when Jim Smith inexplicitly rejected my request for compensation.
38. Also on September 15, 2020, Jim Smith communicated by email and telephone with me and Ms. Nitka with respect to the dental practice cases. Mr. Smith informed us that the Defendant could not take on the dental cases, despite the prior approval by Caleb Meyer, Defendant's Managing Partner. This was due to concerns over conflicts of interest that had not previously existed. During the exchange of emails and the telephone conversation, Jim Smith raised no objection to the compensation formula previously submitted to him. See annexed Ex. "21."
39. On October 1, 2020, Ms. Nitka left her position with Defendant and there was no longer a local managing partner resident in New York. See annexed Ex. "22." At this time Michelle

Harden may have been designated as the local managing partner, but she continued to work principally from the Denver office and was rarely present in New York.

40. Defendant's other attorneys continued to work remotely. But commencing on September 29, 2020, I began working on site at the newly opened and down-sized three-room office at 833 Third Avenue. The only other employee who was occasionally present at the office, usually two days a week, was Jason Rickets, a non-lawyer with the title Legal Assistant.

41. Soon thereafter, I submitted another status report to Jim Smith in an email message of October 29, 2020. See annexed Ex. "23." Jim Smith agreed to follow up on my report with a phone conversation. At no point did Mr. Smith indicate that he had any problem with the "of counsel" submissions made earlier in 2020. Mr. Smith never responded in writing to my report of October 29.

42. Also on October 29, 2020, the C.O.O. of Defendant, Michelle Harden, scheduled a meeting with me and others in the New York office for the following week. See annexed Ex. "24."

43. However, on November 2, 2020, along with the entire management team in Denver, Michelle Harden caused an "**Importance:** High" office wide memo to be sent to New York. The memo warned, one day before the November 3, 2020 Presidential Election, that the NYPD was "expecting rioting" and "to work remotely at least tomorrow (Election Day) and Wednesday . . .". See annexed Ex. "25."

44. On January 20, 2021, I spoke to Jim Smith, and he again voiced no objection to the compensation formula that I had submitted. See annexed Ex. "26." After the discussion with Mr. Smith, I continued to generate work and collect all the fees billed.

45. On February 16, 2021, managing partner Caleb Meyer included me on a firm wide memo commending the attorneys for their hard work. The memo celebrated the financial success and ongoing expansion, which included the addition of new offices, partners, and attorneys. See annexed Ex. "27."

46. With respect to *pro bono* matters, during 2020, 2021, and 2022, I transmitted my list of clients to Michelle Harden, the C.O.O., who was particularly interested in *pro bono.* See annexed Ex. "28."

**The Legal Fee Income That I Generated and Collected**

47. I generated legal work for Defendant, commencing on May 1, 2020, and continuing through March 31, 2022. Plaintiff's Doc Prod. D000012, D000104.

48. I brought Defendant current on the billing and collections by submitting his time entries and monitoring the fee collections on a monthly basis to Robin Long, Defendant's Billing Manager.
49. I sought the compensation in an email to Jim Smith dated March 1, 2022. See annexed Ex. "29," Plaintiff's Doc Prod. S000208.
50. Consistent with the prior exchanges between the parties and Defendant's course of conduct in agreeing to compensate Defendant's other "of counsel" attorneys on the basis of the fees collected, and at the invitation of Jim Smith to submit a self-evaluation and business plan for the upcoming year, I asked the Defendant for compensation on the basis of the 40% agreement previously exchanged by the parties, or on the basis of a fair and reasonable alternative formula proposed by Defendant. *Id.*
51. My submission on compensation reflected on the effect of the Covid shutdown, the severe limitations the shutdown placed on client development, and the fact that all of the other New York-based attorneys continued to operate on a remote basis and were rarely present in the New York office. *Id.*
52. Jim Smith did not respond to my March 1, 2022 compensation email for almost two months, a period during which I continued to generate legal work and collect fees for Defendant's benefit. I continued to rely on the parties' original agreement on the payment of compensation, as described above in paragraphs 24, 25, 26, 27, 28.
53. Defendant also unlawfully denied the wages I was entitled for the work I undertook for Defendant during the period I served as *de facto* office manager and clerk for Defendant's New York office during the Covid shutdown. I served as the sole person physically present in Defendant's New York office during the Covid shutdown, a period when all of the other attorneys of Defendant worked remotely. I managed the receipt of correspondence, including court related filings, handled, hired, and managed a part-time staff, and managed all office activity including the scheduling and conduct of depositions, meetings, and client social gatherings. See paragraphs 22, 23, 40.
54. Mr. Smith engaged in fraud with respect to the parties' compensation agreement by failing to respond to my compensation formulas and by failing to submit accurate information on the payment formula utilized in calculating the compensation payable to Defendant's "of counsel" attorneys.

55. Defendant collected $254,957.59 in fees as a result of my efforts.

Dated and Executed:

August 28, 2026
Mt. Vernon, NY

s/Steven Kent

---

STEVEN KENT

Plaintif *Pro Se*
651 N. Terrace Avenue #6B
Mt. Vernon, NY 10552
646 641 2391
stevenkentatty@gmail.com